## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

-----------------------------------------------------

UNITED STATES OF AMERICA, *ex rel.,*
NOELLE WEBB,
10221 Doncastle Ct.
Mechanicsville, Virginia 23116

                    Plaintiffs,

    V.

DEPOMED, INC.,
7999 Gateway Blvd., Suite 300
Newark, California 94560

                    Defendant.

-----------------------------------------------------

Civil Action No. _____

**Filed Under Seal
Pursuant to
31 U.S.C. § 3730**

## COMPLAINT OF THE UNITED STATES

The United States of America (the "Government"), by and through its *qui tam* Relator,

Noelle Webb ( "Relator"), bring this action under the Federal False Claims Act, 31 U.S.C. §

3729-3733, *et seq.* (the "False Claims Act" or "FCA") against Depomed, Inc. ("Depomed" or

"Defendant") to recover all damages, penalties, and other remedies provided by the False Claims

Act on behalf of the Government and the Relator, and for their complaint allege:

    1.    Based on the Relator's personal knowledge and further investigation, sufficient

evidence exists to allege that Defendant has violated and continues to violate the False Claims

Act, 31 U.S.C. § 3729, by submitting fraudulent bills to the government (and/or through its

conduct in causing others to submit fraudulent bills to the government) as a result of kickbacks

and off-label marketing.

## PARTIES

    2.    Relator has been in pharmaceutical sales since 1987, and worked for Defendant

(in multiple capacities) from 2011 until 2013.   Relator's address is 10221 Doncastle Ct., Mechanicsville, VA, 23116.

3.      Plaintiff United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare").

4.      Defendant Depomed is a specialty pharmaceutical company focused on developing and commercializing products to treat pain and other central nervous system conditions.   Founded in 1995, the company's principal executive offices are located at 7999 Gateway Blvd., Suite 300, Newark, CA 94560. Depomed trades on the Nasdaq (DEPO) and has a market cap of $767 million.   Depomed markets four FDA-approved products, Gralise (gabapentin) tablets for the management of Postherpetic Neuralgia ("PHN"), Cambia (diclofenac potassium) for acute treatment of migraine attacks with or without aura in adults 18 years of age or older, Zipsor (diclofenac potassium) liquid filled capsules for relief of mild to moderate acute pain, and Lazanda (fentanyl) nasal spray CII for the management of breakthrough pain in cancer patients. This action concerns Depomed's marketing and sales of Gralise and Lazanda.

## JURISDICTION AND VENUE

5.      Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

6.      The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.*, and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

7.      Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and will serve the complaint

on the Attorney General of the United States, and the United States Attorney for the District of Columbia, as well as a statement of all material evidence and information currently in its possession and of which it is the original source. These disclosure statements are supported by material evidence known to the Relator at the time of filing establishing the existence of Defendant's false claims. Because the statements include attorney-client communications and work product of Relator's attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relator understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND

### *The False Claims Act*

8.      The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

> (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

3

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the

Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

9.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

### *The Anti-Kickback Statute*

10.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B) ("AKS"), prohibits offering to pay or paying any remuneration "to any person to induce such person to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal healthcare program." *Id.* Pursuant to the AKS, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare and Medicaid. In order to ensure compliance, every federally-

funded health care program requires every provider or supplier to ensure compliance with the provisions of the AKS and other federal laws governing the provision of health care services in the United States.

11.     A violation of the AKS constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the AKS must be excluded from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(b).

12.     Compliance with the AKS is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA.  42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]. . . ."); *see also United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 315 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA.").  The AKS was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the AKS are also a violation of the FCA. 42 U.S.C. § 1320a-7(b)(g). The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." Public Law No. 111-148, § 6402(h).

13.     Compliance with the AKS is a condition of payment under federal health care

programs.  Therefore any violation of the AKS is a violation of the False Claims Act because claims seeking payment for services or prescriptions tainted by kickbacks are either "factually false" or "legally false," and therefore do not meet the conditions of payment from federal health care programs.

### The Stark Law

14.     The Stark Law, 42 U.S.C. § 1395nn, *et seq.* (the "Stark Law"), prohibits a pharmaceutical manufacturer from paying remuneration to physicians for referring federal health care beneficiaries to the manufacturer for certain "designated health services," including drug prescriptions, where the referring physician has a nonexempt "financial relationship" with that manufacturer.  42 U.S.C. § 1395nn(a)(1), (h)(6).  The Stark Law provides that the manufacturer shall not cause to be presented a Medicare or Medicaid claim for such prescriptions.  The Stark Law also prohibits payment of claims for prescriptions rendered in violation of its provisions.  42 U.S.C. § 1395nn(a)(1), (g)(1).

15.     Knowingly paying physicians to induce them to prescribe a prescription drug on-label or off-label for individuals seeking reimbursement for the drug from a federal health program or causing others to do so, while certifying compliance with the Stark Law (or while causing another to so certify), or billing the Government as if in compliance with these laws, violates the FCA.

## FACTUAL BACKGROUND

### I.     Overview of Medicare and its Benefits

16.     Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities.

17.     Medicare Part D began January 1, 2006 and pays for prescription drug benefits for the elderly and disabled.  42 U.S.C. § 1395w-101 *et seq.*  All persons enrolled in Medicare Part

A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D.  Health and Human Services ("HHS"), through its component agency, the Centers for Medicare and Medicaid Services ("CMS"), contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage.  Such companies are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.

18.   Medicare Part D requires all participants in the program -- prescription drug plan ("PDP") sponsors, Pharmacy Benefit Managers ("PBM"), and pharmacies -- to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse.  42 C.F.R. § 423.505(h)(1).  Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions.  42 C.F.R. § 423.505(i)(3)(v).

19.   The federal government's target is to pay 74.5% of the actual costs of basic prescription drug coverage (as defined at 42 U.S.C. § 1395w-1029(a)(3)).  42 U.S.C. § 1395w-115(a).  Rather than a straight reimbursement, however, the government uses economic incentives and disincentives to encourage both beneficiaries and Part D Plan sponsors to reduce costs.  42 U.S.C. § 1395w-115.

20.   For beneficiaries, the disincentives for running-up high drug expenditures include requiring them to pay certain amounts out-of-pocket (in the aggregate referred to as a beneficiary's True Out-Of-Pocket ("TrOOP")).  Those sums include:

   a.   a beneficiary premium equal to 25.5% of the national weighted average plan bid, as adjusted (approximately $350), 42 U.S.C. § 1395w-113(a);

   b.   a deductible defined as 100% of the first $250, as adjusted (although 90% of Part D Plans eliminate the deductible and use a tiered co-pay), 42 U.S.C. § 1395w-102(b)(1);

c.    thereafter a 25% co-pay on all costs up to the coverage gap, 42
U.S.C. § 1395w-102(b)(2);

d.    100% of costs between $2,250 and $3,600, as adjusted, 42 U.S.C. §
1395w-102(b)(3) & (4) (the "coverage gap" or "donut hole"); and

e.    whereafter, the beneficiary enters the catastrophic coverage phase
and only pays a co-pay of 5%, or $2 for a generic drug and $5 for
any other drug. 42 U.S.C. § 1395w-102(b)(4)(A)(i).

21.    Because beneficiaries are required to pay a significant co-pay, and 100% of the

cost of drugs while they are in the deductible and coverage gap phases of the program, Medicare

Part D provides certain protections to beneficiaries.   For example, sponsors must make the

negotiated prices available to beneficiaries regardless of what "phase" of the Part D benefit an

enrollee is in (i.e. deductible, ordinary coverage, coverage gap or catastrophic coverage).   In

addition, that negotiated price must also remain uniform within a particular pharmacy regardless

of what phase of the program the beneficiary is in.   Prescription Drug Benefit Manual, Ch. 5

"Benefits and Beneficiary Protections," § 20.6 ("the negotiated price for a particular covered Part

D drug purchased at a particular pharmacy must always be the same regardless of what phase of

the Part D benefit an enrollee is in").

22.    Another beneficiary protection is that, while they are in the deductible or

coverage gap phases where they pay 100% of the costs, they may avail themselves of a cash

price that is better than their PDP's negotiated price if the pharmacy is offering a "'special' price

or other discount for all customers, or if the beneficiary is using a discount card."   Prescription

Drug Benefit Manual, Ch. 14 "Coordination of Benefits," § 50.4.2.   If the beneficiary makes

such a purchase outside their plan, their expenditure will still count toward their TrOOP if

they report it to their plan. Id.

23.    For Part D Plan sponsors, the program is a quasi-free market model that uses a

variety of incentives which are part of the structure of the program. The starting point is that the program only pays the Sponsor "interim payments . . . based on the Secretary's best estimate of amounts that will be payable after obtaining all of the information." 42 U.S.C. § 1395w-115(d)(1). In other words, Medicare Part D is not a capitated federal insurance program, but rather an actual cost program. *Id.*; *see also* 42 U.S.C. § 1395w-112(g) (prohibiting states from imposing premium taxes on Part D subsidy since, unlike Part C, the payments are not capitated premiums); *compare to* 42 U.S.C. § 1395w-114(c)(2) (expressly authorizing capitated payment only for those Part D beneficiaries in the lowest income tier who qualify for greater subsidy).

24.     In a nutshell, the sponsor submits a bid based on actuarial data estimating the actual cost of providing prescription drugs to its pool of beneficiaries. The government then makes "interim payments" to the sponsor on a monthly basis. As an express condition of receiving those interim payments, the sponsor is required to submit to the government truthful and complete data, including actual cost, for every prescription filled. At the end of each year the government then compares its interim payments to the actual cost data, and determines whether the sponsor owes a refund to the government, or whether the government is required to pay more money in order to meet its subsidy target. In order to further incentivize the Sponsor to keep costs down, however, the refund or additional payment is first subject to risk corridors which penalize the Sponsor if actual costs exceed its bid, and reward the sponsor if actual costs are below its bid. 42 U.S.C. § 1395w-115(e). As a practical matter, these risk corridors would only slightly increase or decrease the total percentage paid by the government for each prescription.

## II.   Medicaid

25.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's

Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average.  42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

26.     The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary ("Secretary") through CMS.  42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  42 U.S.C. §§ 1396b(a)(1), 1903(a)(1).  The federal government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ."  *See* 42. U.S.C. § 1396b(a)(1).  This federal-to-state payment is known as federal financial participation ("FFP").

27.     The Medicaid programs of all states reimburse for prescription drugs.  The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs.  Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter.  CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter.  The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures).  42 C.F.R. § 430.30.

## III.    The TRICARE Program

28.     TRICARE, formerly known as CHAMPUS, is a managed health care program established by the Department of Defense. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

29.     The regulatory authority establishing the TRICARE program does not cover drugs not approved by the FDA. *See* 32 C.F.R. § 199.4(g)(15)(i)(A).

30.     TRICARE does not cover drugs used for off-label indications unless such off-label use is proven medically necessary and safe and effective by medical literature, national organizations, or technology assessment bodies. *See* 32 C.F.R. § 199.4(g)(15)(i)(A)(Note).

## IV.    The United States Food, Drug, and Cosmetic Act

31.     The United States Food and Drug Administration ("FDA") regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. §§ 331(d), 355(a).

32.     The United States Food, Drug and Cosmetic Act ("FDCA") establishes the framework for regulation of, *inter alia*, the sales and marketing activities of pharmaceutical manufacturers in the United States, including the introduction of new drugs into interstate commerce. When the FDA approves a drug, it approves the drug only for the particular use for which it was tested. While a physician may prescribe a drug for a use other than the one for which it is approved, the FDCA prohibits a drug manufacturer from marketing or promoting a drug for non-approved uses. 21 U.S.C. §§ 331(d), 355(a). It therefore is illegal for a drug manufacturer and its sales representatives to initiate discussions with medical professionals regarding any off-label use of a drug.

## IV.    Defendants' Fraudulent Conduct

A.    **False Claims Act Violations**

33.    Defendant has, since at least October 2011, engaged in off-label marketing and in an unlawful kickback scheme with respect to the drugs Gralise and Lazanda that was intended to, and did in fact, induce physicians to improperly prescribe these medications.  These prescriptions were reimbursed by federal health care programs, including Medicare, Medicaid and Tricare, and therefore were issued in violation of the AKS, the Stark Law and the FCA.  As a result of Defendant's misconduct, the Government has been defrauded and suffered a substantial loss.

34.    Depomed owns and sells Gralise, a sustained release gabapentin ("GBP") drug. Gralise is approved by the FDA for *only one use*:  the treatment of PHN.  PHN is more commonly known as post-shingles pain, and is a form of neuropathic pain that can last for months or years following a case of shingles, even after the virus is no longer active.  Of particular import to this case, and because of differing pharmacokinetic profiles, Gralise is *not* interchangeable with other gabapentin-based products.  The FDA approved Gralise for PHN on July 28, 2011.  Depomed launched Gralise in October, 2011.

35.    The main difference between Gralise and other GBP products approved for sale in the United States is that Gralise is a once-a-day sustained release medication containing GBP, whereas GBP is typically taken three times a day and is not sustained release.  That Gralise need be taken only once-a-day provides substantial benefits for patients beyond simple ease of use. GBP produces profound and unpleasant side effects – mainly dizziness and somnolence shortly following ingestion.  Gralise, however, is indicated to be taken approximately 5 hours prior to "bedtime", and the aforementioned side effects eventuate and dissipate while the patient is sleeping – yet because the drug is sustained release the patient still experiences pain relief through his or her waking hours.

36.    Lazanda is a fentanyl-based rapid onset opioid ("ROO") nasal spray designed to

13

treat breakthrough cancer pain in patients already being treated with opioids.   According to its

package insert:

> Lazanda (fentanyl) nasal spray is indicated for the management of breakthrough
> pain in cancer patients 18 years of age and older who are already receiving and
> who are tolerant to opioid therapy for their underlying persistent cancer pain.
> Patients considered opioid tolerant are those who are taking at least: 60 mg of oral
> morphine/day, 25 mcg of transdermal fentanyl/hour, 30 mg oral oxycodone/day, 8
> mg oral hydromorphone/day, 25 mg oral oxymorphone/day, or an equianalgesic
> dose of another opioid for a week or longer. Patients must remain on around-the-
> clock opioids when taking Lazanda.

> Lazanda is contraindicated for patients who are not already tolerant to opioids
> because life-threatening respiratory depression and death could occur in patients
> not taking chronic opioids. For this reason, Lazanda is contraindicated in the
> management of acute or postoperative pain, including headache/migraine, or
> dental pain.

> Lazanda is intended to be prescribed only by healthcare professionals who are
> knowledgeable of and skilled in the use of Schedule II opioids to treat cancer
> pain.

37.   The FDA approved Lazanda in June 2011.   At the time, Archimedes Pharma,

U.S., Inc. owned and began marketing Lazanda.   Archimedes sold Lazanda to Depomed in July

2013, and Depomed began marketing Lazanda in October 2013.

### 1.   Depomed Marketed Gralise and Lazanda for Off-Label Use

38.   As discussed in more detail, below, Depomed actively marketed the off-label use

of its drugs Gralise and Lazanda, in violation of the FDCA, the AKS, and the FCA.   The FDA

regulates the marketing approval or clearance, labeling, and promotion of pharmaceutical,

medical device, and biologic products in the United States.   These products may only be labeled,

promoted, and advertised for the uses that the FDA has approved or cleared.   *See United States v.*

*King-Vassel*, 728 F.3d 707, 709-10 (7th Cir. 2013) ("Under the applicable interlocking

provisions of the False Claims Act and laws governing Medicaid, the federal government

generally will not pay for medications prescribed for purposes not approved by the FDA.").

39.     As explained in more detail below, Depomed actively and deliberately marketed Gralise for off-label use.  In particular, Depomed trained and pressured its sales representatives to target selling the drug to physicians who did not treat PHN as any meaningful component of their patient census.  In fact, even those physicians that did see PHN patients usually only saw one to two patients per year.  Relator regularly asked the physicians on whom she called how many PHN cases they saw each year, and never received a response greater than one to two patients.  Notably, Relator was *never* told to ask that question by her superiors because to ask such a question and receive such a response is not conducive to selling large amounts/any Gralise.

40.     Sales representatives were further instructed to equate Gralise to other drugs containing GBP (even though this was not true) so that physicians would use it in place of GBP. That Depomed intentionally marketed Gralise off-label is not subject to credible dispute: Depomed's own sales forecasts and goals (discussed in more detail, herein) show that Depomed accounted for its off-label marketing when it set those targets.

41.     The Company's scheme was straightforward.   Depomed provided sales representatives with lists of top prescribers of GBP and other GBP products as well as a "sales pitch" to use when promoting Gralise to physicians that primarily consisted of conveying that Gralise provided the same relief as GBP, but without the side effects.  This conduct, as explained in more detail below, constitutes a *prima facie* case of off-label marketing because, according to the FDA, Gralise is "not interchangeable with other gabapentin products."

42.     The main focus of Depomed's off-label marketing scheme for Gralise involved targeting physicians prescribing large quantities of GBP and other GBP products.  Depomed

directed its sales representatives to then equate Gralise to GBP and other GBP products, such as Lyrica, despite the fact that the conditions for which Lyrica is approved markedly exceed those for which Gralise is approved.  Further, given the specialties and practices of the physicians targeted by Depomed it is highly unlikely that they would have meaningful patient populations suffering from PHN.

43.     According to Relator, by February 2012 – just four months following the public launch of Gralise – it was obvious from the lack of sales that Gralise was poised to be a disaster for Depomed.  In large part, the problem was that the Company was targeting the "wrong" doctors if it wanted to sell large amounts of Gralise.  At launch, in October 2011, and until February 2012, sales representatives were directed to target, primarily, primary care physicians – not pain management doctors.  For a drug designed to treat PHN that is being properly marketed, this makes sense.  PHN is usually treated by primary care physicians.  Shingles is not a life threatening condition, and in most cases the pain associated with it promptly self-resolves.  Most patients seeing a doctor for shingles simply have no need to see a specialist beyond their regular primary care physician.  Given as much, very few patients go on to see a pain management specialist or anesthesiologist, or any doctor other than their primary care physician, for PHN. But the Company quickly realized that if they wanted Gralise to be profitable, they would need to create conditions where Gralise was prescribed as a matter of course by doctors for the same types of chronic and ongoing pain conditions typically treated with GBP.  Thus, for the drug to be successful, Depomed had to market Gralise to doctors who often prescribed GBP, and to create conditions under which the doctors would begin prescribing Gralise in favor of GBP.

44.     According to Relator, in February 2012, Depomed researched which doctors were writing large numbers of prescriptions for GBP, created a target list, and then instructed its sales

representatives aggressively to market predominantly to these doctors. In the words of the Company's managers, sales representatives were supposed to "live in the offices where gabapentin is being prescribed" and that serve substantial patient populations that have "good managed care coverage." The phrase "live in the offices" meant, according to the instructions of Relator's superiors, to call on the doctor in his or her office at least once a week or, preferably, two or three times a week.

45.    The first instruction meant that sales representatives – rather than focusing on doctors likely to see large numbers of PHN cases (if such doctors even existed such that they could be targeted) – were instead directed to market heavily to those doctors who wrote large numbers of prescriptions for GBP, primarily pain management specialists and orthopedists (who see few, if any, PHN cases), and to convince these doctors that Gralise was everything that GBP was and more.

46.    The second instruction meant that sales representatives were directed to market to doctors who served patient populations that were largely composed of individuals with health coverage likely to approve Gralise. According to Relator, this meant that they were to target doctors serving patient populations covered by Tricare (or select Medicaid states or any "favorable managed care environment"), as prescriptions for Gralise were approved as a matter of course and almost never challenged.

47.    Doctors who not only wrote large amounts of GBP, but also had good managed care coverage were called, by Depomed "Super Docs." The Company mandated that sales representatives call frequency on "Super Docs" exceed that of regular physicians.

48.    Further, according to Relator, Depomed management routinely and expressly instructed its sales representatives to "go after the pain guys" and if "they are prescribing GBP or

Lyrica at all" that Depomed should "get that business." The Company called such business "low-hanging fruit."

49.    Depomed also placed a "value" on each physician on its target list based on how many GBP prescriptions he or she writes. In March 2012, Relator was provided with a list of several physicians that were added to her call list in her territory. The list shows that the criteria used to determine a physician's value is the volume of GBP products a physician writes – not how many PHN cases he or she sees. That is, the physicians writing the most GBP prescriptions are considered the most valuable because they have the greatest potential for switching their patients to Gralise. Similarly, the number of prescriptions a given physician writes for the drug Cymbalta is also used as a factor to determine a physician's value to Depomed. But Cymbalta is not indicated for PHN. Instead, the doctors who write large numbers of prescriptions for Cymbalta are typically physicians who treat neuropathic pain conditions such as fibromyalgia, a very large and lucrative market for off-label use of Gralise.

50.    In addition to exerting great pressure on its sales representatives to promote to these non-PHN treating physicians, Depomed used other techniques to encourage its sales representatives to promote Gralise off-label.

51.    One vehicle Depomed utilized to target physicians prescribing large amounts of GBP was its "Pain Center Initiative." According to Relator, in the fall of 2012, Depomed launched the Pain Center Initiative as a mechanism to sell Gralise off-label. Through the Pain Center Initiative, Depomed identified pain management centers in each territory prescribing large quantities of GBP. The manager for each territory would then visit five of these centers (determined by Depomed management) in a given district and offer speaker positions and/or clinical studies to the physicians.

52.     Depomed also encouraged sales representatives to target high-prescribers of GBP through its "Go Vertical" contest ("Go Vertical"). Depomed launched Go Vertical in March 2012. Through Go Vertical, Depomed rewarded sales representatives, in addition to their normal compensation, for convincing physicians in their districts to prescribe Gralise. Go Vertical awarded points to sales representatives and their districts for all "Normalized TRX's generated during the contest period." Significantly, Go Vertical awarded *3 points* for each TRx (or total prescriptions) from a pain management prescriber, while only awarding *1 point* for each TRx from a primary care physician. Go Vertical was a huge success in increasing Depomed's sales of Gralise. Indeed, according to the Company, Depomed's sales of Gralise grew almost 70% between February 2012 and March 2012.

53.     According to Relator, sales representatives were instructed to focus on "large writers," that is physicians who write more than 25 Gralise prescriptions per quarter. Relator had two of the country's top prescribers of Gralise in her territory. Both physicians were pain management specialists, and neither of them treat, or treated, any significant amount of patients with PHN. The two physicians are:

> Brian Weaver, M.D. (Southeast Pain Care, Norfolk, VA): Dr. Weaver is board certified for Anesthesiology and Pain Medicine. Dr. Weaver was very valuable to Depomed because his practice is located in Eastern Virginia, a territory with a substantial Tricare patient population, and he was one of the top five writers of Gralise on the East Coast. According to Relator, Dr. Weaver always "had a patient that was perfect for Gralise." Dr. Weaver switched all of his patients prescribed to GBP to Gralise. And Dr. Weaver prescribed Gralise for a variety of conditions – almost none of which were PHN – including: lower back pain, fibromyalgia, generic peripheral neuropathy, and diabetes driven neuropathies. Indeed, Dr. Weaver was so valuable to Depomed that when Relator informed her manager she was leaving Depomed, he immediately contacted Dr. Weaver (and visited him in person, along with Dr. Newman) to make sure that he continued to write prescriptions for Gralise even though Relator was leaving. Dr. Weaver spoke repeatedly on behalf of Gralise (discussed in more detail, below) for which he was paid $2,000 to $3,000 per engagement. Upon information and belief, Dr. Weaver is still a major writer of Gralise.

Mark Newman, D.O. (Tidewater Pain Management, Williamsburg, VA): Dr. Newman is board certified for Anesthesiology and Pain Medicine. Dr. Newman was also one of the top twenty-five Gralise writers on the East Coast. According to Relator, in spring 2012, at which time Dr. Newman was already one of the nation's largest Gralise writers, Dr. Newman stated that he "finally" had a patient with PHN and the drug worked.

54.    In addition to the physicians just mentioned, Nickolas L Pezzella III, M.D., a physical medicine and rehabilitation specialist who, since 2004, *only* treats back pain (according to his website), was also in Relator's territory. Dr. Pezzella was a "high value" physician because he was the largest GBP prescriber in her territory. However, Relator was reluctant to call on him as he did not treat PHN. Despite not treating PHN, Relator's manager would track the number of times she called Dr. Pezzella, the number of times she had lunch with him, and how much money she spent on him, as evidence of whether or not she was "doing her job."

55.    Depomed's sales force compensation plan also provided an incentive to sales representatives to market the drug for unapproved uses. Depomed paid its sales representatives a salary plus a bonus based upon sales. The purpose of the bonus portion of the compensation was to motivate sales representatives to increase use of Gralise among their customer prescribers. Depomed's compensation plan provides additional compensation to sales representatives for prescribers who write 25 or more prescriptions per quarter. Specifically, the plan provides additional compensation to sales representatives who can convince these "large writers" to increase their prescriptions. According to Relator, the target audience is – not surprisingly – generally pain management specialists because they are already prescribing a high number of GBP prescriptions. And, again, very few of these prescriptions are written for PHN, as it is an uncommon diagnosis.

56.    On several occasions, Relator told her manager that she was uncomfortable

marketing Gralise in the offices of physicians that did not treat patients suffering from PHN. According to Relator, her manager would typically respond by telling her that Depomed's corporate office determines her targets and she has to visit the office even if the physician only treats one PHN patient.  Moreover, Relator was further instructed that if the physician had at least one PHN patient, Relator was to market Gralise to them in preference to Lyrica, Neurontin, or GBP, despite Gralise's sole use indication.

57.   Despite instructions, Relator typically refrained from marketing Gralise to these physicians because doing so would violate the law.  As a result, she was admonished for not "living in the offices" of pain management specialists and orthopedists.  Indeed, as Relator's pushback against Depomed's off-label marketing scheme increased, so too did Depomed's pressure to promote Gralise off-label.  Relator was constantly given poor reviews and told that she should have more sales due to her territory's high volume of Tricare patients (discussed in more detail, below).  Relator was admonished in this way despite the fact that she consistently ranked highly among Gralise sales representatives in total sales.  According to Relator, the pressure placed on her to promote Gralise off-label became so great that Dr. Weaver, one of the largest writers of Gralise, wrote a letter to John Hardiman, Depomed's Director of Sales and Clarence Abrams' supervisor, threatening to cease prescribing Gralise if Depomed management decided to replace Relator with someone else.

58.   According to Relator, by early 2013 Depomed management had made it clear that they wanted her gone.  On January 1, 2013, Relator's territory was changed to Virginia Beach and she was assigned a new manager, John Torpy.  The change in territory resulted in a significantly longer commute for Relator, which, due to her health condition, caused a significant obstacle to her ability to do her job.  In addition, upon information and belief, Mr. Torpy was

assigned to be Relator's manager in order to attempt to force her out of the Company.   Indeed, according to Relator, her new manager, Mr. Torpy, would regularly say things along the lines of "why are you even doing this job?" and "why aren't you looking for another job?"   Upon information and belief, Relator's territory was changed and she was reassigned a new manager as a direct result of being too vocal in her concern regarding promotion of Gralise off-label.  All of this led Relator to inform the Company in May 2013 that she would be terminating her employment the following month.

59.     Depomed's intent to promote Gralise off-label is demonstrated by its training and instructions to sales representatives, the Pain Center Initiative, and Go Vertical.   These actions and programs make clear that the target of Depomed's marketing efforts are pain management specialists and orthopedists – physicians who prescribe large amounts of GBP, but have very few, if any, patients suffering from PHN, the sole condition Gralise is indicated to treat.

### 2.     Depomed Affirmatively Marketed Gralise for the Same Indications as GBP and other GBP Medications

60.     To cause physicians prescribing GBP to switch to Gralise, Depomed trains its sales representatives to convince doctors the drugs are interchangeable, except that Gralise had fewer side effects.   According to Relator, sales representatives at Depomed were trained to equate Gralise to GBP, other GBP products, and similar drugs (such as Cymbalta and Lyrica) while, at the same time, touting Gralise's superior side effect profile, with the expectation that this would induce physicians to prescribe Gralise preferentially for all conditions treated by GBP or similar drugs.   In addition to their regular physician calls, sales representatives were *required* to call on two pharmacists each day to specifically instruct them that Gralise and other GBP and GBP-like products were not interchangeable, and that if Gralise was prescribed it must be dispensed.

61.     According to Relator, physicians prescribing GBP, Lyrica, or Cymbalta were referred to by Depomed management as "PHN Market Physicians." Sales representatives were instructed to target PHN Market Physicians – even if the physician only saw one PHN patient per year – because Gralise could easily be equated during the sales pitch to the GBP and similar medications these doctors were already prescribing.

62.     As noted, above, comparing the side effect profiles of Gralise to GBP and Lyrica was central to Depomed's off-label promotion. This is due to the fact that Gralise, a GBP product, can provide substantially the same relief as GBP and other similar products without certain unpleasant side effects. In training its sales representatives, Depomed often used role playing so that they could "properly" promote Gralise off-label. According to Relator, during the role play exercises, Depomed management continuously emphasized that sales representatives should focus on not just the physicians on the Target List, but specifically on those treating large populations patients with favorable managed care status.

63.     Specifically, Depomed had sales representatives "role play" different sales pitches to use on physicians. In the sales pitches and during role play exercises, Depomed management repeatedly instructed sales representatives to mention PHN once, if at all, and then instead to focus on the fact that Gralise contained GBP but had fewer side effects.

64.     One of the sales pitches required sales representatives to mention PHN only once at the outset of the conversation by stating "Gralise is the first and only drug approved for once-daily use to treat PHN." Then, if the physician suggested or responded that he or she had at least one PHN patient, sales representatives were then instructed to ask whether they were writing prescriptions for GBP or Lyrica. If the physician answered in the affirmative, sales representatives were then to discuss GBP and how it was used, and how Gralise could provide

the same relief with fewer side effects.   If the physician responded in the negative, sales representatives were trained to discuss side effect profile, dosing schedule, managed care coverage, but *not* PHN.

65.     Another sales pitch, which according to Relator was preferred by Depomed management, directed sales representatives to "start in the middle," and to only mention PHN if absolutely necessary.   According to Relator, "start[ing] in the middle" meant that sales representatives were to begin their contact with the target physician by comparing Gralise to GBP or Lyrica. For example, according to Relator, one technique taught to sales representatives was to ask a physician "do you have any patients gaining weight on gabapentin or Lyrica? Well Gralise doesn't do that and gabapentin and Lyrica do."   Further, sales representatives were directed to state that Gralise is the "same molecule" as GBP, and because of the lessened side effects, the physician could give their patients Gralise at a higher level to control pain without the unpleasant side effects.  Depomed management repeatedly stressed that PHN was not to be mentioned in this sales pitch.   In fact, Relator was penalized during role play exercises (discussed, below) for bringing up PHN after initially mentioning once.

### 3.     Depomed Targeted Tricare Patients and Other Patients Whose Insurance "Easily" Approved Gralise For Off-Label Use

66.     In addition to the foregoing, Depomed went to great lengths to target Tricare patients because Tricare easily approved use of Gralise, with little or no push back if the patient did not have PHN.  Because Gralise is not typically prescribed as a first line drug, insurance providers normally require a step-edit or prior authorization before they will cover the drug.  But Tricare (and certain other insurers) did *not* require a step-edit or prior authorization to cover off-label Gralise prescriptions.  As a result, areas with large Tricare populations, or "favorable managed care status," such as her territory, as well as other areas served by insurance providers,

24

which did not require step-edits or prior authorization for off-label Gralise prescriptions, were referred to by Depomed management as "momentum markets."

67.    To provide some background, many health insurance providers, as well as Medicare/Medicaid/Tricare, require "step therapy," which requires a "step-edit" before a drug will be covered.  If a step-edit is required, this means that the drug requires a prescription history of specific drugs in the patient's pharmacy claims or data system, and these specific drugs must have been administered to the patient within a certain time frame.  After the specified drugs have been taken within the given time frame, the insurance company will cover the newly-prescribed drug.  This, purportedly, ensures that physicians will not simply skip intermediate treatments that may be effective before prescribing the most expensive drug to treat a particular condition.  Prior authorization is a feature required by insurers and Medicare/Medicaid/Tricare to ensure that certain drugs are prescribed appropriately.  Prior authorization helps to ensure that these drugs are used correctly and *only* when necessary.  In other words, insurers and Medicare/Medicaid/Tricare require prior authorizations to prevent improper prescribing or use of certain drugs that may not be the best choice for a particular health condition.  When a patient brings a prescription, which requires prior authorization, to the pharmacy to be filled, the pharmacist is notified that prior authorization is required.  The pharmacist will then contact the patient's physician, who contacts the insurer to submit additional information, typically in the form of a letter of medical necessity for the prescription.  The insurer will then either grant authorization, and pay for the prescription, or deny authorization, in which case the physician can either appeal the insurer's decision or prescribe a different medication.  Typically, when a patient is prescribed a medication for its indicated use, obtaining prior authorization is relatively simple.  When a physician prescribes a medication for off-label use, however, obtaining prior

authorization can be much more difficult.

68.     To gain market share in these "momentum markets," Depomed directed its sales representatives to target physicians with large Tricare patient populations. The Tricare market was particularly valuable to Depomed because, until October 2012, Tricare classified Gralise as a "tier 2" medication, while the majority of insurance providers classified it as a tier 3 drug. This was of key import to Depomed because drugs classified as tier 2 – unlike tier 3 drugs – do not require a step-edit and/or prior authorization before Tricare will cover the drug. As a result, the ease with which the drug was prescribed and covered, it was much easier to convince physicians to prescribe Gralise to Tricare patients.

69.     Due to the large Tricare patient population in her territory, Relator experienced first-hand how essential Tricare patients were to Depomed's promotion of Gralise. As a result of her territory's large Tricare population, Relator was constantly pressured by Depomed management to capture an even larger share of the Tricare market in her territory. For example, in 2012, Relator was considered Depomed's "Managed Care Expert" for her division. In January 2013, Relator's territory was changed to Virginia Beach, which also has a substantial Tricare patient population . This was due to the fact that she had several physicians in the Tidewater area that treated military patients with Tricare and she could effectively navigate the hazard-strewn waters of managed care programs.

70.     Depomed's reliance on Tricare patients was put in serious jeopardy in October 2012, when Tricare's formulary coverage of Gralise changed and reclassified it as a tier 3 drug and requiring a step-edit before coverage. Because Depomed almost exclusively promoted Gralise off-label, Tricare's formulary change presented a significant obstacle for Depomed. This is so because as a tier 3 medication, Gralise required a step-edit, which made convincing

physicians to prescribe the drug off-label (due to additional required paperwork and often higher co-pays) significantly more difficult.

71.     To combat this obstacle, Depomed adopted a work-around for these obstacles created by Dr. Weaver. According to Relator, this scheme worked as follows for Dr. Weaver and his patients: Dr. Weaver would simultaneously write a 10-day prescription of GBP and a 30-day prescription of Gralise. After 10 days passed, and pursuant to Dr. Weaver's instructions, the patient would proceed to fill the Gralise prescription. This work around allowed Tricare patients to obtain coverage for off-label Gralise prescriptions that should have been denied.

72.     The work around used by Dr. Weaver proved extremely successful in obtaining approval for off-label Gralise prescriptions through Tricare. Taking notice of its success, Depomed strove to inform any and all physicians who may prescribe Gralise of this work around so they too could utilize it to obtain coverage for off-label Gralise prescriptions. To accomplish the foregoing, Depomed regularly hired Dr. Weaver to speak with physicians in markets with large Tricare patient populations. During these speaking engagements, which sometimes would simply consist of dinner with two or three physicians, Dr. Weaver would disclose the work-around for obtaining approval from Tricare for off-label Gralise prescriptions. According to Relator, Dr. Weaver would disclose this work around orally, and Depomed made sure it was never referenced in the slides he used during presentations. Thus, by hiring Dr. Weaver as a speaker Depomed intentionally facilitated the promotion of off-label Gralise prescriptions. Further, Relator was instructed by her superiors to explain the work-around on conference calls among and between sales representatives.

73.     Depomed did not solely target Tricare patients, however. It also targeted any patient with insurance that would cover off-label Gralise prescriptions easily. Sales

representatives were regularly instructed to go after business where they were dealing with "favorable managed care status." According to Relator, "easy" meant the insurance company would approve Gralise regardless of the patient's diagnosis. Depomed ranked physicians based upon their patients' insurance coverage. Specifically, Depomed conducted research to determine which physicians treated a significant amount of patients from "easy" insurance companies. Physicians with large patient populations covered by "easy" insurance companies were determined by Depomed to be more valuable than physicians treating patients with insurance requiring a step-edit or those that categorized Gralise as a tier 3 drug. According to Relator, this information would then be distributed to sales representatives according to their targeted physicians.

74.     Depomed also trained its sales force to expressly bring up the managed care status of the physician's patient population on every sales call. Specifically, sales representatives would inform physicians that due to their patients' insurance coverage their off-label prescriptions would be easily approved, so obtaining coverage would not be an issue.

**4.     Depomed's Own Sales Forecasts and Sales Goals Demonstrate that Depomed had to Sell a Majority of Gralise Off-Label in Order to Meet these Targets**

75.     Depomed's sales forecasts and goals for sales representatives demonstrate that Depomed intended to sell a majority of Gralise off-label because otherwise these targets could not have been met. As already discussed, above, PHN is a relatively rare condition in the United States. According to the Centers for Disease Control and Prevention ("CDC"), approximately 1 million episodes of Shingles occur annually in the United States. The CDC further estimates that of those individuals who develop Shingles, approximately 10%-18%, or 100,000-180,000, of them will develop PHN. This means that nationally, 8,333-15,000 cases of PHN occur per month in the United States. If this figure is divided evenly across all fifty states, there are

approximately 167-300 episodes of PHN per month, per state.

76.     Depomed's own sales forecasts and sales goals demonstrate that Depomed intended to market Gralise for off-label use.  For example, Relator's territory was comprised of the eastern half of Virginia, a relatively small territory.  Despite its size, Depomed set Relator's quarterly quota for new RXs at 399.

77.     But, based on the above math, her territory (half of a state) would only likely see 250-450 episodes of PHN, and far fewer would be serious enough, or longstanding enough, to warrant treatment with Gralise.  Given as much, the Company necessarily was forecasting that a substantial portion of its sales of Gralise would come from off-label prescriptions.

78.     Further, according to Relator, Go Vertical (discussed above) was designed to produce five new Gralise prescriptions each week in her territory, which is an unrealistic goal if sales representatives promote Gralise only for its approved indication.  According to research performed by Relator, she estimates that there were approximately 1-4 instances of PHN in her territory per week.  Therefore, she could not produce 5 new prescriptions each week even if every new PHN patient in her territory was prescribed Gralise.  In addition, Relator was told by several physicians that they only treat approximately one PHN patient per year.

79.     Despite the foregoing, in November, 2012, Relator was producing approximately 20 Gralise prescriptions per week.  Despite obtaining significantly more prescriptions for Gralise than there were episodes of PHN in her territory, Relator was consistently told by her manager that she needed to produce more, and if she did not, the Company might consider closing her territory.

80.     That Depomed presumes a majority of new Gralise prescriptions will be off-label when determining sales forecasts and sales representatives' quotas is further confirmed by

statements made by Relator's manager, Mr. Abrams.  During a February 2012 field ride – which is when a sales representative's manager accompanies him or her in the field to monitor their progress – Relator and her manager had the following conversation:

> *Abrams: You will receive [an] email from me stating that you are in the bottom 10% of sales and outlining what you will need to do to correct it. The people who are doing well are not spending a lot of time talking about PHN. Do you think that your sales were low the first quarter because you talked too much about PHN?*
>
> *Relator:  Yes, I talked about PHN – that's the indication. Too much? I don't know but that is all I am allowed to talk about.*
>
> *Abrams:  When sales forecasts were figured out for Gralise, a certain amount of off-label use was figured into the forecasts because gabapentin is used off-label everywhere.*
>
> *Relator:   I can understand how a forecaster would include that in their estimation. However, holding me responsible for a certain amount of off-label use is not right. I have no control over it and can't discuss it.*
>
> *Abrams:  Well that's the way it is.*
>
> *Relator:  It's not right.*
>
> *Abrams: I disagree with you.*
>
> *Relator:  Again, holding me responsible for something I'm not allowed to talk about is not right. My job is to get the right information to the right people. What they do with that information is their business. I won't talk off-label – it's not worth it.*
>
> *Abrams: No one is asking you to talk off-label.*
>
> *Relator:   If you are saying that a certain portion of my sales is expected to be a spillover from gabapentin, then it is expected, whether specifically stated or not, and that is not right.*

81.     The obvious implication from this conversation:  while the Company gave lip-service to not "talk[ing] off-label" it held sales representatives responsible for off-label prescriptions.

82.    Other territory and district goals for Gralise also demonstrate that Depomed intended to promote Gralise off-label across the country.  According to Depomed's Gralise July 2014 sales goals for its Brooklyn, NY territory, Depomed expected 836.17 new Gralise prescriptions per quarter would be written in that territory.  Moreover, according to Depomed's Gralise July 2014 sales goals for its Carolinas District (comprising of North Carolina and South Carolina), Depomed expected 6,591.61 new Gralise prescriptions per quarter would be written in that district.

83.    Similar to the sales quotas discussed, above, these figures would be impossible to reach if Gralise is prescribed only for its indicated use.  For example, if the high number of PHN episodes per month, per state of 300 is used, this would mean that the total maximum number of PHN episodes in the Carolinas District would be 1,800 per quarter.  Therefore, Depomed's sales goal for the Carolinas District exceeds the maximum expected PHN cases by more than 350%.  Moreover, using the high figure for the national monthly amount of PHN episodes of 15,000, there are approximately 45,000 PHN episodes per quarter nationally.  Therefore, Depomed's sales goal for the Carolinas District indicates that almost 15% of those patients will reside in its Carolinas District, and each patient will be prescribed Gralise.  This is simply not possible, and represents substantial evidence of Depomed's fraud.

### 5.    Depomed Marketed Lazanda For Off-Label Use

84.    According Confidential Witness 1 ("CW1") and Confidential Witness 2 ("CW2"), Depomed also actively marketed its drug Lazanda for off-label use.  CW1 worked as a Depomed sales representative in the Midwestern United States from 2013-2014.  CW2 worked as a Depomed sales representative from 2011-2014.  CW2's first territory was the Long Island, NY area.  Depomed subsequently transferred CW2 to the west coast, where his/her territory included

San Diego, CA, Palm Springs, CA, and Las Vegas, NV.

85.     Lazanda is only indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."  Despite the drug's explicit limitation, Depomed actively promoted Lazanda to physicians *who do not treat cancer patients*.  Not only did Depomed instruct sales representatives to promote Lazanda to non-cancer treating physicians, the Company also discouraged sales representatives from marketing the drug to physicians treating cancer patients, even if the sales representatives were successful in gaining these doctors' business.

86.     As discussed above, the FDA approved Lazanda's limited usage in June 2011.  At the time, Archimedes Pharma, U.S., Inc. ("Archimedes") owned and began marketing Lazanda. According to Confidential Witness 3 ("CW3"), an Archimedes sales representative at the time, Archimedes marketed Lazanda only to cancer treating physicians.  Unfortunately for Archimedes (and CW3), the proper market for such a medication was already saturated.  And, although Archimedes ultimately did gain some market share, it sold Lazanda to Depomed in July 2013. Depomed began marketing Lazanda in October 2013.  Consistent with CW1's and CW2's observations, it was only then that Lazanda sales increased significantly, and only then through off-label marketing by Depomed.

87.     According to CW2, who was a Depomed sales representative when it launched Lazanda, the Company's management, from the start, disregarded the FDA's limitations concerning Lazanda's usage, instructing its sales representatives to target pain management physicians, particularly those who historically wrote large numbers of ROOs and Lazanda-like drugs.  CW1 stated that she experienced similar pressure to target pain management physicians

while at Depomed.

88.     According to CW2, Depomed, over time, became increasingly direct in instructing sales representatives to target pain management physicians.  For a brief period after Depomed launched Lazanda, the target lists distributed by the Company would be accompanied by a disclaimer stating something similar to "remember to market Lazanda within its indications."  However, these disclaimers became less clear and, over time, ceased completely. CW1 also reports that Depomed managers were "very direct" in their discouragement of targeting cancer specialists.

89.     Area managers at Depomed would regularly supply sales representatives with lists of target physicians containing few, if any, physicians treating cancer patients.  According to CW2, his/her manager, Jeffrey McCutcheon, provided him/her a list containing approximately 100 physicians.  Of the 100 physicians listed, only two treated cancer patients.

90.     Depomed also strongly discouraged sales representatives from targeting physicians treating cancer patients.  Indeed, according to the CWs, sales representatives had to "make a case" for using any portion of their allotted marketing money to call on cancer treating physicians.  And employees who did call on cancer treating physicians were chastised.  For example, according to the CWs, Depomed sales representative Richard Askew, who worked in the Los Angeles area, was chastised for targeting, almost exclusively, physicians treating cancer patients.  Mr. Askew was chastised despite the fact that he had been very successful in generating business from these physicians. According to the CWs, despite Mr. Askew's success rate and revenue generation, he was reprimanded for targeting physicians who could prescribe Lazanda for its indicated use.  According to the CWs, Mr. Askew was told to stop targeting these physicians, and to think about how well he could be doing if he was targeting potentially higher

volume writers, such as pain management physicians.

91.     Further, according to CW2, Depomed also hired sales representatives it believed would be more likely to market Lazanda off-label.  At one point during CW2's tenure with Depomed, a wave of new hires – almost exclusively recent college graduates, hired because of their perceived naivety regarding the pharmaceutical sales industry and thus the relevant regulations and laws – were explicitly told to market only to non-cancer treating physicians by Depomed managers, most notably Todd Wittenbach, the company's then head of sales for the United States.

92.     Depomed sales representatives were also trained to deal with (rightful) pushback from physicians.  For example, when confronted with the common statement from a physician that "it's extremely rare that we see cancer patients," Depomed trained sales representatives to divert the conversation to the physician's use of other, similar medications.  For example, sales representatives were trained to respond by saying "well tell me about your patients taking Actiq," and then extol the relative benefits of switching those patients to Lazanda, according to CW2.

### 6.     Depomed's Actual Sales Figures for Gralise Corroborate Relator's Off-Label Marketing Allegations

93.     Depomed's sales figures for Gralise and Lazanda show that, consistent with the allegations contained herein, the Company engaged in off-label marketing.

94.     As explained, above, prior to February 2012, Depomed marketed Gralise for its indicated use, targeting mainly primary care physicians.  In February 2012, however, it became obvious from the lack of sales that Gralise was poised to be a disaster for Depomed.  Therefore, in February 2012, Depomed changed its marketing strategy for Gralise to focus almost exclusively on the off-label market.

95.    Below are the sales figures, in both dollars and units, for Gralise from October

2011 to June 2014:

| DATE | Total Sales $ | Monthly % Change | Total Units | Monthly % Change |
|---|---|---|---|---|
| October 2011 | $1,140,523 | N/A | 616,296 | N/A |
| November 2011 | $254,908 | (78%) | 133,194 | (82%) |
| December 2011 | $508,274 | 99% | 267,006 | 100% |
| January 2012 | $523,733 | 3% | 280,608 | 5% |
| February 2012 | $736,993 | 41% | 396,726 | 41% |
| March 2012 | $1,055,571 | 43% | 566,250 | 43% |
| April 2012 | $1,139,723 | 8% | 615,546 | 9% |
| May 2012 | $1,452,310 | 27% | 671,490 | 9% |
| June 2012 | $1,988,532 | 40% | 911,418 | 36% |
| July 2012 | $1,653,785 | (17%) | 757,206 | (17%) |
| August 2012 | $1,818,886 | 10% | 833,226 | 10% |
| September 2012 | $2,514,166 | 38% | 1,151,076 | 38% |
| October 2012 | $2,120,821 | (16%) | 973,482 | (15%) |
| November 2012 | $2,001,365 | (6%) | 923,424 | (5%) |
| December 2012 | $2,873,913 | 44% | 1,274,088 | 38% |
| January 2013 | $2,484,642 | (14%) | 1,035,804 | (19%) |
| February 2013 | $2,494,778 | .5% | 1,038,798 | .3% |
| March 2013 | $3,311,716 | 33% | 1,381,362 | 33% |
| April 2013 | $2,915,667 | (12%) | 1,127,784 | (18%) |
| May 2013 | $3,213,044 | 10% | 1,234,962 | 10% |
| June 2013 | $4,145,069 | 29% | 1,592,430 | 29% |
| July 2013 | $3,408,779 | (17%) | 1,296,378 | (19%) |

| | | | | |
|---|---|---|---|---|
| August 2013 | $3,736,148 | 10% | 1,371,138 | 6% |
| September 2013 | $5,529,252 | 48% | 1,865,916 | 36% |
| October 2013 | $4,402,500 | (20%) | 1,480,842 | (21%) |
| November 2013 | $4,360,633 | (1%) | 1,465,782 | (1%) |
| December 2013 | $5,455,825 | 25% | 1,751,508 | 19% |
| January 2014 | $4,719,619 | (13%) | 1,435,572 | (18%) |
| February 2014 | $4,651,076 | (1%) | 1,399,482 | (3%) |
| March 2014 | $7,067,356 | 52% | 1,813,812 | 30% |
| April 2014 | $5,851,780 | (17%) | 1,501,878 | (17%) |
| May 2014 | $6,010,600 | 3% | 1,540,968 | 3% |
| June 2014 | $7,771,846 | 29% | 1,992,288 | 29% |

| DATE | Average Monthly Sales $ | Change % | Average Monthly Sales Units | Change % |
|---|---|---|---|---|
| October 2011- January 2012 | $606,859.50 | N/A | 324,276 | N/A |
| February 2012- June 2014 | $3,478,634.31 | 473% | 1,220,711.59 | 276% |

96.     As is immediately clear from even a cursory review of the above chart, beginning in February 2012, when Depomed began promoting Gralise off-label, sales significantly increased.

97.     Indeed, the chart, above, shows the initial spike in sales in February 2012 and March 2012, after Depomed started promoting Gralise off-label – an another strong increase in March, 2012, as a result of the Go Vertical promotion at the Company.  Significantly, the average monthly sales of Gralise increased 473% after Depomed started promoting the drug off-label.  Not only do these figures corroborate Relator's allegations, but additionally demonstrate

that, over time, Depomed became more experienced in promoting Gralise in the off-label market, and as a result gradually continued to increase its sales.

98.     Similarly, Depomed's sales figures for Lazanda also demonstrate its off-label marketing scheme. As described, above, Depomed acquired Lazanda in July 2013. In October 2013, when, according to CWs, Depomed began marketing Lazanda, sales significantly increased from $98,601 that month to sales of $671,322 in May 2014.

**B.     As a Result of the Foregoing, the Claims Submitted to Government Health Care Programs for Off-Label Uses Were Not Covered**

99.     The claims submitted to government health care programs for off-label Gralise and Lazanda prescriptions were false because the prescriptions were not properly covered. As a precondition to payment, healthcare providers are required to verify on Form HCFA-1500 that the prescriptions and services they provide are "medically indicated and necessary for the health of the patient." As shown, above, the prescriptions that Depomed was inducing physicians to write were neither medically indicated nor necessary. Rather, as set forth in detail above, they were expressly for off-label and improper uses and violated the FCA.

100.    In the Medicaid Program, States will not receive FFP if a drug, as prescribed, is not for a medically acceptable use. FFP is available to States only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). As a result, States' own laws and pharmacy regulations require the drugs to be used for a medically accepted use, and, therefore, fit the definition of a covered outpatient drug.

101.    "Covered outpatient drugs" do not include drugs that are "used for a medical indication which is not a medically accepted indication." 42 U.S.C. § 1396r-8(k)(3). A medically accepted indication is defined as a use "which is approved under the [FDCA]" or which is "supported by one or more citations included or approved for inclusion" in specified

drug compendia. 42 U.S.C. § 1396r-8(k)(6). 42 U.S.C. § 1396r-8(g)(1)(B)(I) identifies the compendia to be consulted: American Hospital Formulary Service Drug Information; United States Pharmaeopeia-Drug Information; and the DRUGDEX information System (collectively, the "Drug Compendia").

102. Medicare Part A generally pays the inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§ 1395e-1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting, and are "reasonable and necessary."

103. Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting, and that are "reasonable and necessary." 42 U.S.C. §§ 1395k(a), 1395x(s)(2); 42 C.F.R. § 405.517. These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anticancer drugs and antiemetics (drugs which control the side effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer. 42 U.S.C. §§ 1395k(a), 1395x(s)(2); 42 C.F.R. § 405.517.

104. The Medicare program Part D drug benefit covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k).

105. The off-label uses alleged herein are not supported by "clinical research that appears in peer-reviewed medical literature," and could not, under any circumstances, be determined to be "medically accepted as safe and effective" or "reasonable and necessary" for such uses. Claims for such off-label uses were therefore not covered by Medicare either. Moreover, off-label Gralise and Lazanda prescriptions covered by Tricare were not covered

because the off-label uses alleged herein have not been proven medically necessary and safe and effective by medical literature, national organizations, or technology assessment bodies.

106.    Depomed was aware that the natural and probable consequence of its promotion of off-label uses of Gralise and Lazanda was that health care providers would submit claims for payment to Government Healthcare Programs for the off-label use. Notwithstanding this knowledge, Depomed vigorously promoted these off-label uses.  Depomed was also aware that its illegal promotion did in fact result in false claims to these and other government payors for the off-label uses.  Moreover, Depomed was aware that its promotional activity was a substantial factor in producing the claims.

107.    When pharmacies, physicians and other healthcare providers submitted claims based upon a physician's prescription for Gralise and Lazanda for off-label uses, the claims they submitted were false because such off-label uses were not supported by a citation in one of the Drug Compendia specified by 42 U.S.C. § 1396r-8(g)(1)(B)(1) (Medicaid), not supported by "clinical research that appears in peer-reviewed medical literature," and could not, under any circumstances, be determined to be "medically accepted generally as safe and effective" or "reasonable and necessary" (Medicare).

108.    False claims to these government health care programs for off-label prescribing were the direct and proximate result of unlawful off-label marketing efforts by Depomed.  Therefore, Depomed caused the submission of these claims.

**C.    Depomed Provided Prescribing Physicians With Kickbacks to Increase Lazanda Sales**

109.    In yet another attempt to increase revenue and market share, Depomed paid illegal kickbacks to physicians to induce them to write Lazanda prescriptions that were reimbursed through federal health care programs.  As a front for its kickback arrangement, Depomed

conducted speaker programs that were actually vehicles for paying kickbacks to physicians under the guise of honoraria. These financial benefits were offered with the understanding that, in exchange, the physicians would preferentially prescribe or indicate the use of Lazanda to their patients. Through Depomed's speaker program, physician speakers were ostensibly paid to speak at ongoing speaking engagement events to educate other doctors and health care professionals about Lazanda. In practice, however, Depomed's speaker program exists to induce physicians to increase the quantity of Lazanda prescriptions they write.

110.    Specifically, Depomed offered ongoing speaker positions to pain management physicians, whom it deemed "high writers" – physicians writing five or more prescriptions per month. These speaking arrangements usually consisted of dinners with colleagues. Significantly, these speaking engagements never included physicians who treat cancer patients. For example, according to CW2, a pain management physician assistant named Mr. Adler (believed to be Jeremy Adler, MS, PA-C of Pacific Pain Medicine Consultants) informed CW2 that he would "never in a million years" recommend/prescribe Lazanda because he attended a Lazanda speaker event and found only primary care physicians in attendance, which troubled him.

111.    The qualifications of the physicians hired as speakers by Depomed demonstrate that its speaker program was nothing more than a mechanism to facilitate kickbacks in return for writing Lazanda prescriptions. Specifically, the criteria used to determine which physicians to offer speaker positions to depended primarily upon the volume of Lazanda prescriptions he or she had written. As Lazanda's indicated use is pain management for cancer patients, it would be reasonable to expect that the physicians Depomed selected to educate and inform other physicians and health care professionals about the drug would be oncologists, or otherwise have

at least some level of expertise in dealing with cancer patients.  And yet, Depomed did not condition its selection of speakers on whether they had a pedigree that included cancer treatment. Instead, Depomed focused solely on those physicians who wrote the most prescriptions for Lazanda.  And, because Depomed's focus was on rewarding high writers and not on actually educating, Depomed did not screen speakers based on academic or clinical accomplishments. Where a speaker's curriculum vitae ("CV") was relatively unspectacular, Depomed would simply not provide it to the speaker's "audience."  CW2 recalls a specific example in which a high writer/speaker's CV was never circulated before his speaking engagements because he attended medical school at the Universidad Autónoma de Guadalajara (Guadalajara Medical School), a school that was not prestigious enough.

112.     Depomed also provided direct kickbacks in order to win new business.  For example, on March 18, 2014, Depomed's National Associate Director of Sales, Dan Hansen, and CW2's supervisor (believed to be Jeffrey McCutcheon) had dinner at Juniper & Ivy, a San Diego restaurant, with neurologist/pain management physician Dr. O'Carroll (believed to be C. Phillip O'Carroll, M.D. of Newport Beach Neurologists) for the purpose of obtaining his business. After the meeting, CW2's supervisor contacted him/her to cancel their planned "ride along" scheduled for the next morning.  When CW2 pressed for a reason for the cancellation, his/her supervisor explained that Dr. O'Carroll told him and Hansen at dinner that he would only prescribe Lazanda if Depomed hired his wife to serve as a sales representative.  Of note, Dr. O'Carroll previously had informed CW2's predecessor, that he would "never write [Lazanda], it's a shit drug."  Nevertheless, Depomed fired CW2 two weeks later, dissolved his/her large territory and gave the newly created San Diego territory to its new hire, Dr. O'Carroll's wife (name unknown, but CW2 believes her last name not to be O'Carroll).

41

113.   The foregoing demonstrates Depomed's intent to induce physicians to preferentially prescribe Lazanda to their patients.  Clearly, providing a physician's wife with a position at Depomed in exchange for the preferential prescribing of Lazanda constitutes the provision of remuneration for health services in which payment was made by federal health care programs.  Therefore, this arrangement violates the AKS and, as a result, the claims submitted to government health care programs were paid in violation of the False Claims Act.

114.   In addition, Depomed's speaker program also demonstrates its intent to induce physicians to preferentially prescribe or indicate Lazanda to their patients.  The speakers selected by Depomed were incapable of prescribing (or at best, highly unlikely to prescribe) Lazanda for its indicated use because their patient populations did not have cancer.  Moreover, Depomed selected speakers who were high writers of Lazanda and attempted to conceal the fact that they had virtually no experience treating cancer patients.  Indeed, Depomed's selection of non-cancer treating physicians, as well as their attempt to conceal this fact, demonstrates that Depomed intended and did, in fact, utilize its speaker program to fraudulently induce Lazanda prescriptions by providing illegal compensation to prescribing physicians.

### COUNT I
### (False Claims Act 31 U.S.C. § 3729(a))

115.   Relator repeats each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

116.   As described above, Defendant has submitted and/or caused to be submitted false or fraudulent claims to Medicare by engaging in off-label marketing and providing kickbacks to referring physicians.

117.   By virtue of the acts described above, Defendant have violated:

(1)   31 U.S.C.  § 3729(a)(1)(A) by knowingly presenting, or causing to be

42

presented, false or fraudulent claims for payment or approval; and/or

      (2)    31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

      (3)    31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

      118.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator realleges that Defendant knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to amendment, by engaging in the above-described conduct.

      119.    By reason of the foregoing, the Government has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

## JURY TRIAL DEMANDED

      120.    Relator demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays that the Court enter judgment against Defendant as follows:

      (a)    that the Government be awarded damages in the amount of three times the damages sustained by the Government because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, provides;

      (b)    that civil penalties of $11,000 be imposed for each and every false claim that Defendant caused to be presented to the Government and/or its grantees, and for each false record or statement that Defendant made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c)     that attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case be awarded;

(d)     that Relator be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(e)     that this Court order such other and further relief as it deems proper.

Dated: October 3|, 2014

**THE CASPER FIRM, LLC**

Ari S. Casper
One South Street, 27th Floor
Baltimore, Maryland 21202
Telephone: (410) 989-5097
Facsimile:  (410) 630-7776
acasper@casperfirm.com

**THE WEISER LAW FIRM, P.C.**
Christopher L. Nelson
James M. Ficaro
22 Cassatt Avenue, First Floor
Berwyn, Pennsylvania 19312
Telephone: (610) 225-2677
Facsimile: (610) 225-2678
cln@weiserlawfirm.com
jmf@weiserlawfirm.com

*Attorneys for Relator*